IN  THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FRANCIS C. MBEWE, #360922              *

Petitioner,                            *

   v.                                 *  Civil Action No. JKB-14-1676

FRANK BISHOP,                          *
and THE ATTORNEY GENERAL OF THE
STATE OF MARYLAND,                     *

Respondents.                           *

                                                ***

## MEMORANDUM OPINION

Petitioner Francis C. Mbewe ("Mbewe") seeks habeas corpus relief pursuant to 28 U.S.C. § 2254, attacking the constitutionality of his 2010 convictions in the Circuit Court for Montgomery County.  (ECF Nos. 1 & 5).  Respondents were directed to respond to the Petition and have done so.  (ECF No. 11).  Mbewe filed a reply, in the form of a declaration.  (ECF No. 20).  This matter has been fully briefed.  Upon review, the Court finds no need for an evidentiary hearing.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2014); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (Petitioner not entitled to hearing under 28 U.S.C. § 2254(e)(2)).  For reasons that follow, Mbewe's Petition for writ of habeas corpus IS DENIED AND DISMISSED WITH PREJUDICE.

### Background and Procedural History

On July 22, 2009, Mbewe was arrested and charged with armed robbery, conspiracy to commit armed robbery, and second degree assault.  (ECF No. 1 at 4.)  After a jury trial, Mbewe

and a co-defendant, Delonte Johnson, were convicted on February 22, 2010, on all counts.  (*Id.* at

4-5; ECF No. 5 at 1.)  On April 20, 2010, Mbewe was sentenced to serve 15 years in prison.[1]

(ECF No. 1 at 5; ECF No. 5 at 1-2.)  Mbewe filed a Notice of Appeal on April 23, 2010, and, in

an unreported opinion dated October 12, 2011, the Court of Special Appeals of Maryland

affirmed the judgment as to both Mbewe and Johnson.  (ECF No. 1 at 5; ECF No. 5 at 2; Resp.

Ex. 11.)[2]  Two weeks later, on October 26, 2011, Mbewe filed a *pro se* petition for writ of

*certiorari* in the Court of Appeals of Maryland (ECF No. 1 at 5; Resp. Ex. 12), followed on

November 18, 2011, by a counseled petition for writ of *certiorari* (ECF No. 1 at 5; Resp. Ex.

13).  On January 23, 2012, the Court of Appeals denied further review.  (ECF No. 1 at 5; ECF

No. 5 at 3.)  Mbewe did not file a petition for writ of *certiorari* to the United States Supreme

Court.  (ECF No. 5 at 3.)

Also on April 23, 2010, Mbewe filed a *pro se* petition for post-conviction review in the

Circuit Court for Montgomery County, followed by several *pro se* supplements as well as a

counseled amended petition and a supplement thereto.  (ECF No. 1 at 5; ECF No. 5 at 3; Mbewe

Ex. 1.)[3]  A hearing was held on May 14, 2014, and the circuit court denied post-conviction relief

on the record at the end of the hearing.  (ECF No. 1 at 5; Resp. Ex. 15.)  The court's Statement of

Reasons and Order of Court, with attached transcript, was issued on June 11, 2014.  (Resp.

Ex. 15 at 1.)  Mbewe did not file an application for leave to appeal the denial to the Court of

Special Appeals.  (ECF No. 1 at 4.)

---

[1] Specifically, Mbewe received 15 years each for Counts One and Two, to run concurrently, and 10 years for Count Three, also to run concurrently.  (ECF No. 5 at 1.)

[2] Respondents filled a Notice of Filing of Lengthy Exhibits (ECF 11-1) with their Answer, and the exhibits were filed in paper format.

[3] Mbewe's exhibits were filed with his original Petition (ECF No. 1).

Petitioner filed his federal Petition on May 19, 2014,[4] presenting seventeen claims of error for the Court's review.  (ECF No. 1.)  At the Court's direction (ECF No. 3), Petitioner subsequently filed a supplement to the Petition (ECF No. 5).  On August 26, 2014, Respondents filed their Answer.  (ECF No. 11.)  Petitioner's Reply was filed on January 4, 2016.  (ECF No. 20).

**Standard of Review**

Section 2254 states that a district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

**I.      Threshold Considerations**

**A.  Exhaustion**

The exhaustion doctrine, codified at 28 U.S.C. § 2254(b)(1),[5] "is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings.  Under our federal system, the federal and state courts [are] equally bound

---

[4] The Petition is dated May 19, 2014, and is deemed filed on that date.  *See Houston v. Lack*, 487 U.S. 266, 276 (1988).

[5] Section 2254(b)(1) states that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--
> (A)  The applicant has exhausted the remedies available in the courts of the State; or
> (B)  (i) there is an absence of available State corrective process; or
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
> (C)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the state, within the meaning of this section, if he has the right under the law of the state to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b)(1).

to guard and protect rights secured by the Constitution." *Rose v. Lundy*, 455 U.S. 509, 518 (1982) (alteration in original) (internal citations and quotation marks omitted).   Moreover, "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation ...." *Id.*   Thus, the *Rose* Court cautioned litigants, "before you bring any claims to federal court, be sure that you first have taken each one to state court."   *Id.* at 520; *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 839 (1999) ("Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court.").

### B.  Procedural Default

In *O'Sullivan*, the Supreme Court stated: "To ... 'protect the integrity' of the federal exhaustion rule, we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.*, whether he has fairly presented his claims to the state courts."   526 U.S. at 848 (internal citation omitted); *see also id.* at 844 ("Section 2254(c) requires only that state prisoners give the state courts a *fair* opportunity to act on their claims.").   The inquiry, then, is "[w]hether a prisoner who fails to present his claims in a petition for discretionary review to a state court of last resort has *properly* presented his claims to the state courts.   ...   Because we answer this question 'no,' we conclude that [petitioner] has procedurally defaulted his claims."   *Id.* at 848.   Stated differently, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."   *Id.* at 845.   The *O'Sullivan* Court noted, however,

> In this regard, we note that nothing in our decision today requires the exhaustion of any specific state remedy when a State has provided that that remedy is unavailable.   Section 2254(c), in fact, directs federal courts to consider whether a

4

> habeas petitioner has "*the right under the law of the State to raise, by any available procedure,* the question presented." (Emphasis added.) The exhaustion doctrine, in other words, turns on an inquiry into what procedures are "available" under state law. In sum, there is nothing in the exhaustion doctrine requiring federal courts to ignore a state law or rule providing that a given procedure is not available.

*Id.* at 847-48; *see also Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)) ("A procedural default also occurs when a habeas petitioner fails to exhaust available State remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'").[6]

When a claim is procedurally defaulted, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits; or (2) that failure to consider the claim on the merits would result in a fundamental miscarriage of justice, i.e., the conviction of one who is actually innocent. *See Murray v. Carrier*, 477 U.S 478, 495-96 (1986). "Cause" consists of "some factor external to the defense [that] impeded counsel's efforts to raise the claim in State court at the appropriate time." *Breard*, 134 F.3d at 620. In order to demonstrate prejudice, a habeas petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982); *see also Carrier*, 477 U.S. at 494 (quoting *Frady*). Even when a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it

---

[6] A procedural default may also occur when a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent State procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999); *see also Breard*, 134 F.3d at 619.

should reach the merits of a petitioner's claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 314-15 (1995).

### C.  Strickland

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Representation is deficient if it falls below an objective standard of reasonableness, considering all the circumstances. *Id.* at 688.

To satisfy the first part of this standard, it must be demonstrated that counsel's performance was not "within the range of competence normally demanded of attorneys in criminal cases." *Id.* at 687.  The standard for assessing such competence is "highly deferential" and has a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 669.  A federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. *See* 28 U.S.C. § 2254(d)(1).  A petitioner must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689).  "There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (citations and internal quotation marks omitted); *see also Sharpe v. Bell*, 593 F.3d 372, 383 (4th Cir. 2010) ("Counsel is not required to engage in the filing of futile motions.").  "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review

is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

The second prong requires the court to consider whether counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable and whether there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 690-94. "The benchmark of an ineffective assistance claim must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Id.* at 686. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. A determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted had the attorney been deficient. *See id.* at 697.

The principles governing ineffectiveness claims apply in federal collateral proceedings as they do on direct appeal or in a motion for new trial. *Id.* at 697. Indeed, the presumption that a criminal judgment is final is at its strongest in collateral attacks on that judgment. *Id.*

## II. Analysis Framework

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

7

A state adjudication is "contrary to" clearly established federal law under § 2254(d)(1) where the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under the "unreasonable application analysis," a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In other words, "a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

Under section 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.*

Further, "a determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe*, 593 F.3d at 378. This is especially true where the state court has "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.*

## Discussion

I.     **Exhaustion and Procedural Default**

Respondents argue that "Mbewe's current petition contains numerous claims that have not been presented to all appropriate state courts." (ECF No. 11 at 17). They note that, while there are procedural barriers that may prevent Mbewe from bringing those claims in state court at this point (*id.* at 13-15), Mbewe has one potential avenue of relief available to him; he could file a motion to reopen his post-conviction proceedings[7] (*id.* at 15). Therefore, they contend, the Petition should be dismissed unless Mbewe withdraws his unexhausted claims. (*Id.*).

Mbewe raised his insufficient evidence claim on direct appeal to the Court of Special Appeals and included it in his *pro se* petition for writ of *certiorari* to the Court of Appeals. (Resp. Ex. 11 at 2; Resp. Ex. 12 at 2-4). Therefore, this claim has been exhausted.

Mbewe's claim that the trial court erred in its response to a jury question regarding whether there could be a hung jury as to Mbewe's guilt was raised on direct appeal and in both his *pro se* and counseled petitions for writ of certiorari. (Resp. Ex. 9 at 13; Resp. Ex. 12 at 4-9; Resp Ex. 13 at 2.) He advances related claims in his Petition in this Court, albeit not in the same form as the claim before the Maryland appellate courts.[8] The Court does not view these claims as exhausted.

With respect to his other claims, Mbewe states that he "presented and exhaus[t]ed his claims on direct appeal to the Maryland Court of Special Appeals and Maryland Court of Appeals, in his brief, even though the court failed to rule on the merits on direct appeal ...."

---

[7] "The court may reopen a postconviction proceeding that was previously concluded if the court determines that the action is in the interest of justice." Md. Code. Ann., Crim. Proc. Art. § 7-104 (2008).

[8] Several arguments made in support of Mbewe's claim in his *pro se* petition for writ of *certiorari* to the Court of Appeals of Maryland are raised as separate claims here.

(ECF No. 1 at 3).  He lists fourteen claims (*id.* at 4), which apparently were contained in a *pro se* brief filed in the Court of Special Appeals (ECF No. 17-1).  That brief, filed when Mbewe was represented by counsel, was returned to him by the Clerk of the Court of Special Appeals.[9]  (*Id.*). Thus, the claims were never properly before that court.

Mbewe represents that he presented revised claims on the same issues in his post-conviction proceeding, which were denied at the May 14, 2014, hearing.  (ECF No. 1 at 4.) However, he did not file an application for leave to appeal the denial of his post-conviction petition, stating that he "has already presented these claims before the Maryland Court of Special Appeal[s] and it will be futile to present the claims to the Maryland Court of Special Appeals the second time on the Application for Leave to Appeal." (*Id.*).  Again, however, the claims had not been properly presented to the Court of Special Appeals previously, and by declining to file an application for leave to appeal, Mbewe has not "give[n] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," *O'Sullivan*, 526 U.S. at 845, as to his remaining claims.  The Court concludes that the majority of Mbewe's claims have not been raised in all appropriate state courts and are thus unexhausted and, arguably, procedurally defaulted.

Mbewe may overcome the procedural default by demonstrating both cause for the procedural default and prejudice that will result from the Court's failure to consider the claims on the merits, s*ee Carrier*, 477 U.S at 485-96; *Breard*, 134 F.3d at 620, or, alternatively, that failure to consider the claims will result in a fundamental miscarriage of justice, that is, the conviction of one who is actually innocent, *see Schlup*, 513 U.S. at 314-15; *Wolfe v. Johnson*,

---

[9] The difference between the two situations is that Mbewe was already represented by counsel when he attempted to file this *pro se* brief in the Court of Special Appeals, (ECF No. 17-1), whereas he filed his *pro se* brief in the Court of Appeals before being represented by counsel (Resp. Ex. 12; Resp. Ex. 13).

565 F.3d 140, 160  (4th Cir. 2009) ("A proper showing of 'actual innocence' is sufficient to satisfy the 'miscarriage of justice' requirement." (citing *House v. Bell*, 547 U.S. 518, 536-37 (2006))).  In addition to arguing that he has exhausted his state court remedies, Mbewe argues the latter.

## II.  Actual Innocence

Mbewe seeks to use actual innocence as a gateway to overcome the exhaustion requirement and procedural default of any claims deemed unexhausted or procedurally defaulted.[10]  (ECF No. 1 at 2); *see also Schlup*, 513 U.S. at 315.  In his Petition, he contends that "the trial court prevented petitioner from using evidence which would have helped petitioner establish actual innocen[c]e and produced a different verdict" (ECF No. 1 at 2), by granting the State's motion *in limine* to exclude a videotaped statement he made which he describes as "exculpatory" (*id.* at 3).  Subsequently, in his declaration/reply, he states that "[i]n March of 2012 he discovered new reliable exculpatory scientific evidence revealing that the State['s] main witness Corporal Kukucka gave a false K9 expert testimony in human scent identification by K9 Saber." (ECF No. 20 at 1.)  Both of these arguments are presented as separate issues in the Petition and will be discussed *infra*.  They are addressed here for the limited purpose of determining whether Mbewe has demonstrated that he is actually innocent of the crimes for which he was convicted in order to overcome the procedural default of the majority of his claims.

"[A] § 2254 petitioner asserting actual innocence as a procedural gateway is obliged to demonstrate that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'"  *Wolfe*, 565 F.3d at 164 (quoting *Schlup*, 513 U.S. at 327).  A credible claim

---

[10] Mbewe also raises actual innocence as a separate ground for relief in Ground Sixteen.  (ECF No. 1 at 52-53.)

of actual innocence requires a petitioner "to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. In addition, the petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327. Mbewe cannot make either showing.

With respect to the videotaped statement, although it is true that the allegedly "exculpatory" statements were not presented to the jury as evidence during Mbewe's trial, Mbewe has not demonstrated how they were exculpatory. He claims that he was never asked if he knew his co-defendant at the time of his arrest (ECF No. 1 at 3), which apparently would be reflected in the videotaped statement, although he testified at trial that he did tell the police that he did not know Jordan (Resp. Ex. 4 at 197).[11] Mbewe also claims that his videotaped statement

---

[11] Mbewe characterizes the question as "a false leading question during cross examination by the prosecutor ...." (ECF No. 1 at 3). The relevant portion of the transcript follows:

Q       Now, it's your testimony today --

A       Yes.

Q       -- that you do know Delonte Jordan.

A       Yes.

Q       Do you remember telling the police that you did not know Delonte Jordan?

A       Yes, I do.

Q       So, you lied to the police?

A       At the time --

Q       Yes or no?

A       Yes.

(Resp. Ex. 4 at 197).

would have refuted allegedly false statements made by Detective Georgia Frazier in the application for statement of probable cause and undermined the prosecution's theory of the case (ECF No. 1 at 3, 37), without further explication.  Moreover, the statement clearly cannot be considered "new" evidence, as it existed at the time of his trial.

As to Mbewe's claim of "newly discovered evidence," Mbewe states:

> In the year 2013 a dog-tracking expert was retained on behalf of petitioner by the Office of the Public Defender, Collateral Review Division.  The K9 expert reviewed the testimony of Corporal Kukucka at trial, Corporal Kukucka['s] training records and qualifications, and Sabre['s] training records which were determined to be helpful to petitioner's allegation of error.

(ECF No. 20 at 3).

The calendar belies Mbewe's contention that the evidence he cites is "newly discovered." Mbewe filed his initial *pro se* post-conviction petition in the Circuit Court for Montgomery County on April 23, 2010 (ECF No. 5 at 3; Resp. Ex. 1), followed by *pro se* amendments, supplements, and/or memoranda on August 19, 2010, November 10, 2010, March 13, 2012, January 14, 2013, January 31, 2013, and September 16, 2013 (Resp. Ex. 1).  Post-conviction counsel filed an amended petition, incorporating Mbewe's *pro se* claims, on September 18, 2013, and a supplement to the amended petition on September 23, 2013.  (Resp. Ex. 1; Mbewe Ex. 1; Resp. Ex. 15.)  On May 14, 2014, a hearing was held on the counseled amended petition and supplement thereto.  There is no reason given by Mbewe why this evidence could not have been presented to the post-conviction court prior to or at the hearing—if, in fact, it was not presented. Moreover, Mbewe has not presented the Court with any expert report (or explanation as to how it was "helpful"), or anything other than his own unsubstantiated declaration, to support his allegations regarding Corporal Kukucka's "perjured testimony" and "unreliable" identification of Mbewe.  (Mbewe Ex. 1 at 14; ECF No. 20.)

13

Mbewe has provided this Court with no "new evidence" on the basis of which "no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup,* 513 U.S. at 327.   Further, as will be discussed *infra*, there was sufficient evidence presented at trial to convict him.   In short, Mbewe has not made the showing required to demonstrate actual innocence and "pass through the gateway" in order to have his unexhausted and/or procedurally defaulted claims heard. *Id.* at 316.

### III. Insufficient Evidence

As stated above, Mbewe's claim that there was insufficient evidence to support his conviction (Ground Seventeen) (ECF No. 1 at 53-54) has been exhausted, as it was presented to the Court of Special Appeals on direct appeal (Mbewe Ex. 2 at 9-13), and, after that court affirmed his conviction, in his *pro se* petition for a writ of *certiorari* to the Court of Appeals (Resp. Ex. 12 at 2-4).   Accordingly, the Court turns to the merits of the claim.

The Court of Special Appeals, viewing the evidence in the light most favorable to the State, the prevailing party, summarized the evidence presented at trial as follows:

> Around 5:40 a.m. on July 22, 2009, the 7-Eleven convenience store at the corner of Briggs Chaney Road and Old Columbia Pike was robbed.  A store clerk and two patrons inside the store and one patron outside the store at the time of the robbery testified for the State.  The store clerk testified that he was standing next to the cash register when three men entered the store with t-shirts covering their heads, hiding their faces.  The clerk testified that the first man stood in front of the counter and pointed a gun at him; the second man jumped over the counter and ran up to him; and the third man stood near the front door.  The robber who had jumped over the counter hit the clerk in the head a few times and demanded that he open the register.  The clerk did as he was told.  That robber took what was later determined to be $45.43 from the register.  The robbers then fled.
>
> A store patron testified that he was at the back of the store when he heard a lot of commotion and observed three men robbing the store.  The men had t-shirts over their faces; two of the men wore black t-shirts; one of the men wore what the patron thought was a white t-shirt.  A second patron testified that he was near the front door when three black men with shirts covering their heads rushed into the store.  He tried to exit the store but the third robber told him to "get down,

get down." The patron apparently did not move fast enough so that robber stomped on him two or three times, forcing him to the ground. Around this time, a third patron had pulled into the parking lot of the store. As she was getting out of her car, she saw three men run out of the store with t-shirts over their heads. Two of the men had black t-shirts over their heads; one had a white t-shirt. She saw the three men run to the left of the store and down an embankment that led to some woods.

The robbery took less than 30 seconds. Neither the clerk nor the three patrons were able to identify the robbers. The store surveillance system recorded the robbery. The tape was played for the jury and admitted into evidence as well as photographs from the tape. The tape and photographs showed a black man wearing a white sleeveless shirt with a light gray shirt covering his head running into the store with a gun. It showed a second black man without a shirt on but with a black t-shirt covering his head jump onto the counter to get to the register. Because of the angle of the camera, the third robber was not shown on the film.

After the robbers fled, the store clerk immediately called the police, who responded within five minutes. Based on the officers' conversations with the clerk and patrons, the police broadcast a description of the robbers and secured the perimeter of the building.

Corporal Paul Kukucka, a fifteen-year veteran with the Montgomery County K-9 unit, and Saber, his German Shepherd, arrived shortly thereafter. Corporal Kukucka testified extensively as to his and Saber's training and experiences in tracking. Corporal Kukucka, who was accepted as an expert in the field of K-9 tracking, explained that he and Saber initially went through 14 weeks of training, and that every three weeks they reinforce their skills by attending a ten-hour class. Additionally, they spend six hours every month refreshing their skills.

The corporal testified that humans lose skin cells at a rate of 40,000 per minute, and his dog tracks scent from the skin cells and crushed vegetation. Corporal Kukucka explained that when brought to an area to track, he places his dog in a tracking harness that has a twenty-foot line. The tracking harness signals to the dog that he is to track. The long lead line requires the dog to pull the corporal hard to signal the corporal to follow him.

Corporal Kukucka testified that after he was given a description of the suspects and the area where the suspects were last seen fleeing, he retrieved Saber from his car, put him in his harness, and brought him to the left of the building. It was just after 6:00 a.m. and the day was clear. He instructed Saber to track, and the dog began to do so "immediately." The corporal testified that it was a fresh scent, explaining:

> Having an area where you respond to the scene within a reasonable amount of time, and I consider this an extremely reasonable amount of time, and you put the dog down. And when he starts to pick up on something immediately, it's a fresh, it's a fresh scent.

15

Corporal Kukucka testified that Saber pulled him behind the 7-Eleven to a fence line leading to some woods.  The dog started to "air scent," raising his head in the air to catch the scent.  The corporal added that a scent blown off an object creates a cone of scent and a dog will move from side to side trying to pinpoint the object.

Corporal Kukucka testified that after air scenting, Saber started moving toward the wooded area.  The Corporal looked up and saw three black men looking at him while hiding in the wooded area behind a tree.  Two of the men were wearing dark t-shirts, one was wearing a light-colored t-shirt.  The corporal announced, "Montgomery County Police K-9, stop, or I'm going to release the dog."  The men fled deeper into the woods.  The corporal radioed his location to other officers in the area and Saber began tracking again.  Saber tracked through the woods and into a field.  At that point, the corporal heard rustling as if someone was going back into the woods.  The corporal explained why he continued to follow his dog and not to force his dog to follow the rustling noise:

> Because there's one thing that a good K-9 will always do, and every instructor will always tell you is, always trust your dog, trust, trust your dog.  So, he was on an active, he was on an active scent, I didn't want to pull him off it to check out the noise. ...
>
> So, trusting my dog, I stayed with him, since he was working an active scent[.]

The corporal and Saber continued to track the suspects through the field and into a residential area.  When they were about 40 yards from the back of a house, the corporal saw two of the three men he had seen earlier "hunched" down behind a support column underneath a deck.  As the corporal got closer, he gave another K-9 warning but the two men again fled.  The corporal again radioed his location, and he and Saber continued to track the suspects.  Saber tracked the suspects across several residential streets when the corporal saw the two men running toward a wood pile.  The suspect wearing a white t-shirt hid behind the wood pile while the suspect wearing a light gray t-shirt continued running.  Other officers arrived on the scene and while one officer arrested Jordan behind the wood pile, another arrested Mbewe, who had run a short distance further.

The chase had lasted about an hour and the suspects were arrested near a residential community next to the strip mall in which the 7-Eleven was located.  The police took pictures of the men upon their arrest.  The men were then taken to a police station and searched.  The police recovered $95 from Jordan's person.  Both men smelled of alcohol.

Corporal Kukucka testified that after Jordan and Mbewe were arrested, Saber rested while other K-9 units searched the area for the third suspect and the gun.  They found neither.  Corporal Kukucka then had Saber search the area for items that might have been involved in the robbery. During that search, they discovered an "encampment" about 100 yards to the left from where the corporal

had given the suspects his first K-9 warning.  The encampment contained a chair, a couple of crates to sit on, a fire pit, and a couple of hundred beer cans.  Corporal Kukucka testified that Saber never alerted to the area while tracking the suspects, and when Saber was in the encampment he showed "no interest whatsoever of any scent in that area[.]"

Corporal Kukucka testified that in his expert opinion Saber picked up the robbers scent from the 7-Eleven and had never lost it.  The corporal identified the appellants in court as the two suspects he had tracked.  The 7-Eleven manager testified that he was familiar with the appellants – they were patrons of his store.  No usable fingerprints were found at the crime scene but a shoe print was taken from the counter where the second robber had jumped onto the counter to get to the cash register.  Demetris Henry was arrested two days later.  The print from Henry's shoe was compatible with the print taken from the counter.

Mbewe was the only witness to testify for the defense.  He admitted to recent prior convictions for statutory rape and distributing marijuana.  He testified that at the time of the robbery, he had charges pending against him and that he lived at the encampment.  He explained that because of the pending charges, his mother had filed a protective order against him so he could not live at her home.  The night before the robbery, he and a group of six to eight men were drinking at the encampment.  He admitted to knowing both Jordan and Henry.  Jordan was at the gathering; Henry was not.  At some point, Mbewe fell asleep in a chair but was awoken when he heard Corporal Kukucka issue his K-9 warning.  He ran because he thought he might be arrested – he had been drinking underage (he was 19 years old) and he did not want his Pretrial Services "to violate him" because he was not living with his mother.  According to Mbewe, he ran only a couple of yards before stopping, and while running he noticed that Jordan was running alongside of him.  On cross-examination, Mbewe admitted that when he was arrested he had lied to the police and told them he did not know Jordan.

(Resp. Ex. 11 at 2-7) (alterations in original) (footnote omitted).

Mbewe and Jordan argued to the Court of Special Appeals that there was insufficient evidence of criminal agency to support their convictions, as the only evidence linking them to the robbery was their presence in the woods shortly thereafter.  (*Id.* at 7.)  Further, they contended that the evidence was "consistent with a reasonable hypothesis of innocence, given Mbewe's testimony regarding their presence at the encampment behind the store."  (*Id.* at 8.)

The Court of Special Appeals found the "reasonable hypothesis of innocence" argument inapplicable because there were multiple strands of circumstantial evidence, not a single strand.

(*Id.* at 9.)   The court noted several pieces of circumstantial evidence, including Corporal Kukucka's testimony that Saber "immediately" went into tracking mode when brought to the area where the three robbers were last seen, that during the chase he twice saw Mbewe and Jordan, and that when he gave the K-9 warning the suspects fled.  (*Id.* at 9.)  Viewing all of the strands of circumstantial evidence in the light most favorable to the State, the court concluded that "the evidence was more than sufficient to sustain appellants' convictions."  (*Id.* at 10.)

The Court of Special Appeals utilized the proper standard in reviewing the sufficiency of the evidence, "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  (*Id.* at 8) (quoting *Taylor v. State*, 346 Md. 452, 457 (Md. 1997) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))) (internal quotation marks omitted).  The court reasonably applied that standard to the facts of the case.  Therefore, the court did not incorrectly or unreasonably apply clearly established federal law.  28 U.S.C. § 2254(d)(1).  Moreover, the court's summary of the evidence presented at trial is borne out by the trial transcript. Accordingly, this Court concludes that the Court of Special Appeals did not unreasonably determine the facts "in light of the evidence presented in the State court proceeding."  *Id.* § 2254(d)(2).

Mbewe argues here that "[t]he circumstantial evidence was clearly insufficient to prove beyond a reasonable doubt Petition[er] [was] guilty of the criminal charges in this case including the element of identity as to him."  (ECF No. 1 at 54; *see also id.* at 53.)  He contends that Corporal Kukucka's expert opinion conclusion that the scent Saber was tracking was that of the robbers alone cannot support a guilty finding.  (*Id.* at 53-54.)  Mbewe points to the lack of evidence linking him to the robbery, including the absence of eyewitness identification or

18

fingerprint and DNA evidence.  (*Id.*)  He further notes that he was not shown on the store video surveillance, nor was it his footprint found on the store counter.  (*Id.* at 54.)  What Mbewe overlooks is the fact that all of the above, including Corporal Kukucka's opinion, was known to the trial court, the jury, and the Court of Special Appeals.  The jury found Mbewe guilty based on the circumstantial evidence before it.  The Court of Special Appeals affirmed that judgment.  Mbewe has provided this Court with no basis to question the state courts' decisions.  Therefore, his claim that there was insufficient evidence to support his conviction is rejected.

### IV.  Remaining Claims

As noted above, Mbewe's remaining claims are unexhausted, and he has not overcome the exhaustion/procedural default barrier.  However, the court may deny an application for a writ of habeas corpus on the merits, notwithstanding the applicant's failure to exhaust all state court remedies.  28 U.S.C. § 2254(b)(2).   The Court will, therefore, briefly address the merits of Mbewe's unexhausted claims.[12]

A.  Grounds One and Two

Mbewe alleges that his arrest was illegal because it was "without a truthful showing of probable cause in the Warrant of Arrest as required by the Fourth Amendment of the United States Constitution."  (ECF No. 1 at 10.)  He also argues that evidence seized as a result of the illegal arrest should have been excluded.  (*Id.* at 15.)  The post-conviction court addressed this portion of the claim as follows:

> With respect to the illegal arrest, and he mentions four reasons why he thought it was illegal, even assuming that those statements ... were false statements the remedy would have been to excise those statements and then look at the remaining facts and see whether there was probable cause for the arrest.  And

---

[12] The post-conviction court addressed the majority of these claims, or similar allegations, on the merits and found no merit in any of the claims.

again you just look at the [recitation of] facts by the court of special appeals, there was ample, there was abundant probable cause to arrest the defendant in this particular case ....

(Resp. Ex. 15 at 10-11.)

In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that where a state "has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 495 (footnotes omitted). In Mbewe's case, the state courts clearly provided an opportunity for him to litigate his Fourth Amendment claim.[13]  Mbewe's illegal arrest claim, therefore, provides no basis for relief.

Mbewe further alleges that counsel was ineffective for failing to litigate the claimed Fourth Amendment violation.  (ECF No. 1 at 18.)  The circuit court addressed that allegation as well: "He then argues that the attorney was ineffective for failing to file a motion to suppress the evidence.  Obviously given the fact that the arrest was lawful, there would have been no grounds to move to suppress the evidence that was seized pursuant to the arrest."  (Resp. Ex. 15 at 11); *see also Sharpe*, 593 F.3d at 383 (quoting *Moody v. Polk*, 408 F.3d 141, 151 (4th Cir. 2005)) ("Counsel is not required to engage in the filing of futile motions.") (citation omitted).  In short, Grounds One and Two provide no basis for relief.

B.  Grounds Three and Four

Grounds Three and Four pertain to Corporal Kukucka's pretrial canine scent and tracking identification of Mbewe.  (ECF No. 1 at 20, 29.)  Specifically, Mbewe alleges in Ground Three that the State "failed to disclose pretrial canine scent and tracking identification of petitioner by

---

[13] As noted above, Mbewe chose not to file an application for leave to appeal the circuit court's denial of post-conviction relief (ECF No. 1 at 4), thereby denying the state courts "one full opportunity to resolve any constitutional issues," *O'Sullivan*, 526 U.S. at 845.

State Witness Corporal Paul Kukucka in the Discovery disclosure made to the defense" (*id.* at

20), in violation of Maryland rules and Mbewe's right to due process[14] (*id.* at 20-21, 29).   In

Ground Four, Mbewe claims that counsel rendered ineffective assistance by failing to object to

Corporal Kukucka's testimony, specifically his identification of Mbewe.   (*Id.* at 29.)   Mbewe

also implies that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to turn

over the identification information.   (ECF No. 1 at 22, 24.)

> The post-conviction court stated:
>
>> With respect to the allegations involving Officer Kukucka, there's an allegation of prosecutorial misconduct that they failed to disclose Kukucka's identification as -- of the defendant's, one of the robbers.   It's abundantly clear that the evidence that was presented that they gave disclosure of what Kukucka would testify to and the fact that the end result of his investigation on the scene with the dog track is that from that he concludes that the defendant was one of the robbers; it would not be misconduct to disclose that as basically this is the person that the dog led me to that I arrested, that's him.

(Resp. Ex. 15 at 11-12).   Mbewe has provided this Court with no information to undermine the

circuit court's conclusion that the State had provided the defense with everything it was required

to disclose.   Therefore, because there is no evidence that the State withheld information,

Mbewe's *Brady* allegation, which presumably is the basis for his due process claim, necessarily

fails.   *See Walker v. Kelly*, 589 F.3d 127, 137 (4th Cir. 2009) (quoting *Strickler v. Greene*, 527

U.S. 263, 281-82 (1999), and noting three fundamental components to a *Brady* claim: "(1) The

evidence at issue must be favorable to the accused, either because it is exculpatory, or because it

is impeaching; (2) the evidence must have been suppressed by the State; and (3) the evidence

must be material to the defense, that is, 'prejudice must ... ensue'".) (alterations in original; some

---

[14] If Mbewe's third claim of error were framed solely as a violation of Maryland discovery rules, it would not be cognizable on federal habeas.   *See* 28 U.S.C. § 2254(a).   However, a due process violation is a constitutional violation and is, therefore, cognizable.

internal quotation marks omitted).

The postconviction court continued: "With respect to the attorney was ineffective for failing to object to Kukucka['s] identification, again there's no evidence in the record that supports that allegation and that the attorney was ineffective for failing to move for mistrial because of the identification." (Resp. Ex. 15 at 12.)   This Court agrees.   Because there is no merit to the substantive claim, there is no basis for an ineffective assistance claim.  *See Sharpe*, 593 F.3d at 383 ("since Highsmith's testimony was inadmissible, it was neither objectively unreasonable nor prejudicial to Sharpe's case to refrain from seeking its admission").

### C.   Grounds Five and Six

Mbewe next claims that Corporal Kukucka "gave a false canine expert conclusion testimony at trial regarding human scent identification by canine tracker Saber." (ECF No. 1 at 31.)   Specifically, "Corporal Kukucka testified that, 'in his expert opinion the canine picked up the robbers scent from the store and never lost it.'" (*Id.*)   Mbewe gives several reasons why he believes Corporal Kukucka's testimony was false.[15]   (*Id.*)   Mbewe also alleges in Ground Six that counsel was ineffective for failing to object to the above testimony.  (*Id.* at 35.)

The circuit court found no evidence in the record that Corporal Kukucka perjured himself.  (Resp. Ex. 15 at 12.)   Mbewe has submitted nothing to support his allegations that Corporal Kukucka testified falsely.   He refers to exhibits that were presented to the circuit court, but have not been included in his filings in this Court.   As noted previously, Mbewe has not provided any expert report to substantiate his assertions or undermine Corporal Kukucka's

---

[15] For example, Mbewe states that "[t]here was no K9 tracking by K9-11 Sabre except the spot[t]ing of someone in the woods by K9-17 ...." (ECF No. 1 at 33.)   This statement is directly contradicted by Corporal Kukucka's testimony at trial, (Resp. Ex. 3 at 271-79), and was rejected by the post-conviction court (Resp. Ex. 15 at 11).

testimony.  Mbewe's allegations, standing alone, do not provide "clear and convincing" evidence that the circuit court's finding was incorrect.  28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").  Nor can it be said that the post-conviction court unreasonably determined the facts in light of the evidence before it.  *Id.* § 2254(d)(2).

Again, because Mbewe's substantive claim fails, so, too, does his derivative ineffective assistance claim.  *See Sharpe*, 593 F.3d at 383.  Accordingly, both Grounds Five and Six are rejected.

D.  Ground Seven

In Ground Seven, Mbewe claims that the State's oral motion *in limine* to preclude mention at trial of a videotaped statement he made, which he describes as "wrongfully excluded exculpatory evidence," violated his right to due process under the U.S. Constitution.  (ECF No. 1 at 36, 38.)  According to Mbewe, the videotaped statement would have negated his guilt by "expos[ing] the false videotaped statement made by Detective Georg[ia] Frazier in the application for statement of probable cause which was false."  (*Id.* at 37.)  In addition, Mbewe alleges, Detective Frazier's videotaped statement "would have refuted the State's theory of prosecution that Petitioner wasn't shown on the video surveillance because of the angle of the camera."  (*Id.*)

It does not appear that a formal motion *in limine*, oral or otherwise, was made.  Rather, on the first day of Mbewe's trial, February 17, 2010, before formal proceedings began, a discussion regarding Mbewe's videotaped statement occurred.  (Resp. Ex. 3 at 7-12.)  The

23

Assistant State's Attorney stated he did not plan to introduce the videotaped statement and expressed concern over what could and could not be said during opening arguments.  (*Id.* at 8.) He specifically mentioned the defendants' age and Mbewe's living status being brought up, unless the defendants were to testify.  (*Id.* at 10.)  Defense counsel argued that his ability to cross-examine witnesses should not be limited, and the judge agreed.  (*Id.* at 9.)  The court stated:

> THE COURT: Well, I'm not sure exactly what either one of you are [sic] talking about.  You're not going to be able to get a self-serving statement in through the officer by way of cross-examination, so if there's an objection, it'll be sustained.
>
> MR. SMITH:  Yes, right.
>
> THE COURT: So, in other words --
>
> MR. SMITH:  I'm not planning on --
>
> THE COURT: In other words --
>
> MR. SMITH:  -- trying to get in what he, what Mr. Mbewe said.  I'm planning on, in asking her as to what she did in the course of their investigation.
>
> THE COURT: I don't see any problem with that.
>
> MR. SMITH:  Right.

(*Id.* at 9.)  The trial court advised that it would not rule preliminarily on what might or might not come up during the course of the trial and told the prosecution that if something did come up that the State believed crossed the line, it should object and the court would rule on the objection. (*Id.* at 10-12.)  As it turned out Mbewe did testify, so the statements regarding his age and being homeless became part of the record.  If Mbewe believes any statement the court characterized as "self-serving" was exculpatory and wrongly excluded, he has not identified any such statement.

The Court finds no basis in the transcript for Mbewe's claim that "exculpatory evidence" was excluded.  The prosecution simply stated that it did not intend to introduce Mbewe's videotaped statement into evidence, and a discussion between counsel and the court ensued.  No ruling was made.  Ground Seven is, therefore, rejected.

Grounds Eight and Nine

Mbewe alleges in Ground Eight that the trial judge should have recused himself from presiding at Mbewe's trial after learning of co-defendant Demetris Henry's willingness to plead guilty; presiding at Henry's guilty plea proceeding; hearing a statement of facts implicating Mbewe; and accepting Henry's guilty plea.  (ECF No. 1 at 38.)  Relatedly, in Ground Nine Mbewe claims that counsel was ineffective for failing to object to the above or requesting that the trial judge recuse himself.  (*Id.* at 39.)

Mbewe cites *Brent v. State*, 492 A.2d 637 (Md. Ct. Spec. App. 1985), for the proposition that a trial judge who presided over the guilty plea proceeding of a co-defendant is ineligible to try the defendant.  (ECF No. 1 at 39.)  The post-conviction court disagreed, stating that "there's absolutely no reason why a trial judge has to recuse simply because they [sic] took a plea from a co-defendant.  So there's no basis for the allegation of misconduct."  (Resp. Ex. 15 at 11.)

Mbewe misreads *Brent*.  The issue there was that the trial judge had not only presided over a co-defendant's guilty plea proceeding and heard statements tending to implicate the defendant, but also was aware of the defendant's own expressed willingness to plead guilty. *Brent*, 492 A.2d at 637.  Moreover, *Brent* is distinguishable on other grounds.  In *Brent*, the defendant was found guilty after a bench trial. *Id.* at 638.  In Mbewe's case, he was found guilty by a jury.  Additionally, the issue in *Brent* was a violation of a state rule, *id.* at 640-41, 643, not, as here, a due process claim (ECF No. 1 at 39).  Moreover, Mbewe points to no instances during

25

his trial where the trial judge demonstrated any bias toward his guilt.  *See Addison v. Maryland*, 990 A.2d 614, 623 (Md. Ct. Spec. App. 2010) (noting that the appellant "does not mention, and we have not noticed, one instance during the trial where the judge exhibited any bias in favor of appellant's guilt" and holding that the Maryland rule at issue does not require a judge to *sua sponte* recuse himself after the defendant withdrew his guilty plea).

The circuit court also rejected Mbewe's related ineffective assistance of counsel claim. The court stated: "And there's no ineffective assistance on  [counsel's] part for failing to ask Judge Dugan to recuse himself, there is no basis for him to have made such request.  It would have been totally without merit under the circumstances."  (Resp. Ex. 15 at 11); *see also Sharpe*, 593 F.3d at 383.  Both of Mbewe's claims are meritless.

E.  Grounds Ten, Eleven, Twelve, and Fifteen

Mbewe argues in Ground Ten that the trial court failed to reveal on the record the numerical split of the jury stated in the jury's second note to the court, thereby depriving him of the opportunity to provide input into the court's response, request a majority verdict of not guilty, or "waive his right to a unanimous verdict to achieve an acquittal," all in violation of his constitutional right to due process.[16]   (ECF No. 1 at 43.)   In the same vein, Mbewe claims in Ground Eleven that counsel was ineffective for failing to request a majority verdict of not guilty based on the jury note.  (*Id.* at 43-44.)  Ground Twelve also involves the jury's numerical split, stating that the court denied Mbewe the right to be found not guilty by the jury in violation of several amendments to the U.S. Constitution.  (*Id.* at 44-45.)  Similarly, in Ground Fifteen Mbewe alleges the trial court required the jury to return a unanimous verdict, in violation of the

---

[16] Mbewe also alleges violation of Maryland Rule 4-326 (ECF No. 1 at 41), which the Court declines to consider as it is not a cognizable federal claim, *see* n.14.

Maryland Constitution Declaration of Rights, Article 21, and the Fourteenth Amendment to the

U.S. Constitution.  (*Id.* at 49-50.)

The circuit court rejected similar claims:

> With respect to the next item, that the court engaged in judicial misconduct for not disclosing the split, the split was disclosed -- in any event, any allegation of the court's misconduct would have been waived by the direct appeal. Following that, it's argued that the attorney was ineffective for not requesting a majority verdict.  Mr. Smith could have requested a majority verdict until he was blue in the face but unless the State agrees to a majority verdict, he's not entitled to a majority verdict and with a 10-2 vote for acquittal, it's why the State would never agree to a majority verdict when they know they have two still voting for a conviction, it defies logic, reason, and everything else.  So there's absolutely no basis there.

(Resp. Ex. 15 at 16.)

The transcript reveals the following.  After approximately four hours of deliberation, the

jury sent a note to the judge.  (Resp. Ex. 6 at 4.)  The court reconvened, with all counsel and both

defendants present, but without the jury.[17]  (*Id.*)  The judge read the jury's question—whether

there could be a hung jury on Mbewe's guilt—into the record and stated: "And then they indicate

the split."  (*Id.*)  She did not, however, disclose the numerical split on the record.  (*Id.*)  The court

then asked counsel how they would like it to respond.  (*Id.*)  Mbewe's attorney asked the court to

respond in the affirmative.  (*Id.*)  The State suggested that the jury be told to continue their

deliberations.  (*Id.* at 5.)  After discussion, the judge brought the jury into the courtroom and

asked the foreman if he thought they might reach a unanimous verdict if they had more time to

deliberate.  (*Id.* at 8-9.)  When the foreman indicated that it was possible, following a bench

conference with counsel the court decided to direct the jury to continue deliberating and to give

the jury a supplemental instruction, rather than answer the question at that time.  (*Id.* at 9-10.)

---

[17] A different judge presided over this portion of the proceedings, which Mbewe challenged in the circuit court (Mbewe Ex. 1 at 16), but does not in the instant Petition.

The jury deliberated for the rest of the afternoon (Friday), but did not reach a verdict. (*Id.* at 12.) Accordingly, the jurors were told to return on Monday morning, and the court adjourned for the weekend. (*Id.* at 12, 14.) The judge left the jury note with the clerk. (Id. at 13.) When the trial court reconvened on the following Monday morning, Mbewe's counsel again asked the court (the original trial judge) to answer the jury's question affirmatively. (Resp. Ex. 7 at 4.) The court was not inclined to respond to the note and, instead, instructed the jury to continue deliberating. (*Id.* at 5-7, 14.) Shortly after lunch, the jury returned a guilty verdict against both defendants. (*Id.* at 19-20.)

Although it is true that the numerical split was not placed on the record by the court, it is clear from the transcript of the proceedings that counsel were aware of the specific split, as the Court of Special Appeals recognized.[18]  During the on-the-record discussions and the bench conference, Mbewe's attorney clearly had the opportunity to provide input.  He did what he could to persuade the court to answer the question.  That he was unsuccessful does not render him ineffective. *See Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (observing, in context of counsel's strategic choices, that "[t]he Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight").  Moreover, the court did not "deny" Mbewe the right to be found not guilty, or "require" a unanimous verdict of not guilty; rather, it

---

[18] The Court of Special Appeals opinion denying Mbewe's appeal and affirming his conviction contains the following footnote:

> The note revealed the numerical split, ten for not guilty and two for guilty.  Although the court did not announce the numerical division of the split on the record, it is clear from the discussion on the record that counsel were aware of the numerical split.

(Resp. Ex. 11 at 11 n.2).

28

asked if the jury might be able to reach a majority verdict if given more time and allowed the jury to deliberate further.  There were no due process or other constitutional violations.[19]

### F.  Grounds Thirteen and Fourteen

In Ground Thirteen, Mbewe alleges that the trial court violated his right to be present at every stage of trial when the court reinstructed the jury on February 22, 2010, while he was absent from the courtroom.  (ECF No. 1 at 45.)  He claims violations of both his constitutional right to due process and Maryland Rule 4-231.[20]  (*Id.*)  In Ground Fourteen, Mbewe states that trial counsel rendered ineffective assistance by waiving his right to be present, failing to consult with him before doing so, failing to request a jury instruction regarding his absence, and failing to request that he be present.  (*Id.* at 48-49.)

The circuit court addressed the claims as follows:

> The defendant then argues that he was denied the right to be present at a critical stage.  As I understand it that's when the jury was reinstructed, he was present when the jury was initially instructed in response to the note about being deadlocked.  And then the following -- there was no reinstruction, there was discussion among counsel about what if any further instruction might be required, but no instruction was ever given, so there is no evidence that he was not present in any critical stage.  There's also for the same reason no evidence of any judicial misconduct, and certainly Mr. Smith under the circumstances was not ineffective in waiving the defendant's presence for the purposes of having discussion with Judge Dugan about what if any additional instruction might be necessary should that need [arise] in the future.

(Resp. Ex. 15 at 15-16.)  The court, thus, found as a fact that no instruction was given outside of Mbewe's presence.  Such finding is entitled to deference.  *See* 28 U.S.C. § 2254(e)(1).

---

[19] Mbewe implies that the jury was coerced into finding him guilty.  (ECF No. 1 at 51-52.)  The transcript provides no evidence that this was the case, however.  In fact, the court's supplemental instruction to the jury cautioned that the jurors must decide the case for themselves.  (Resp. Ex. 6 at 10.)  Moreover, after the judge directed the jury to continue deliberating and gave the supplemental instruction, the jury deliberated for another hour that afternoon and all of the following Monday morning.  (Resp. Ex. 6; Resp. Ex. 7.)

[20] With respect to the alleged violation of Rule 4-231, *see* n.14.

Mbewe has provided no evidence, let alone clear and convincing, that he was absent when the jury was reinstructed. (*Id.*). The transcript supports the circuit court's determination. When the trial court reconvened on the morning of February 22, 2010, Mbewe's counsel again asked that the jury's question be answered in the affirmative before the jury resumed their deliberations. (Resp. Ex. 7 at 4.) The court and counsel then engaged in a discussion about what had occurred on Friday afternoon. (*Id.* at 4-7.) The trial judge stated that he was not inclined to answer the note at that time:

> THE COURT: Okay. All right. Well, I'm not going to answer it now. If they send us another note, then I'll make a determination at that time. ...

(*Id.* at 7.)

Before the jury was brought into the courtroom, the clerk asked if the court wanted the defendants, and defense counsel waived their presence. (*Id.* at 12.) At that point the jury was brought into the courtroom. (*Id.*) The court stated that it had been brought up to speed regarding the events of the preceding Friday afternoon and thanked the jury for coming back to resume their deliberations. (*Id.*) After explaining that they would have to use a different courtroom and jury room that day, the court stated: "In any event, thanks, folks, and please continue your deliberations." (*Id.* at 14.) That was the only "instruction" of any kind given to the jury on February 22nd.

Clearly Mbewe's claim is without merit, and counsel cannot be faulted for waiving Mbewe's presence for what was essentially a recap of what happened the previous Friday afternoon, another discussion about whether or not to answer the question, and logistical issues regarding the need to change courtrooms that day.

G.  Ground Sixteen

In addition to his gateway claim, Mbewe raises actual innocence as a separate ground for relief in the Petition.  (ECF No. 1 at 52-53.)  He again argues that "the trial court prevented petitioner from using evidence which would have helped petitioner establish actual innocence and produced a different verdict as in not guilty."  (*Id.* at 52.)  It appears—although this is far from clear—that the evidence to which Mbewe refers is the aforementioned videotaped statement he made after his arrest.  Mbewe notes that the State's theory of prosecution was that he was not shown on the store's surveillance videotape because of the angle of the camera.  (*Id.* at 52-53.)  He further states that "the statement of probable cause would have refuted the State theory of prosecution" because it would have shown that "all of these theor[ies] were fabricated false statements."  (*Id.* at 53.)  Mbewe provides no evidence to support these allegations.

Moreover, the Court has already rejected Mbewe's gateway claim.  As the Fourth Circuit observed in *Wolf*, "[b]ecause the *Schlup* decision mandates a less-stringent showing for an award of gateway relief than *Herrera* requires for an award of substantive relief, [a petitioner] might satisfy *Schlup* and yet fail to meet the extraordinarily high mandate of *Herrera*."  565 F.3d at 165 (internal quotation marks omitted); *see also Schlup*, 513 U.S. at 315-16 (comparing standards); *Herrera v. Collins*, 506 U.S. 390, 417 (assuming for the sake of argument that a constitutional claim of actual innocence exists, "the threshold showing for such an assumed right would necessarily be extraordinarily high").  It follows that, if Mbewe has not met the *Schlup* standard, he clearly cannot meet the "extraordinarily high" *Herrera* standard.

Moreover, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent violation occurring in the underlying state criminal proceeding."  *Herrera*, 506 U.S. at 400.  The Court has found no

31

"independent violation" of Mbewe's constitutional rights.  *Id.*   Accordingly, Mbewe's substantive actual innocence claim fails.

### V.  Summary regarding merits of unexhausted claims

After reviewing the merits of Mbewe's unexhausted and/or procedurally defaulted claims, the Court finds no factual or legal support for them in the record.  Although Mbewe quotes numerous cases in his Petition, because the bases of the claims fail, the cases do not help him.  Therefore, Mbewe's claims are rejected in their entirety.

## CERTIFICATE OF APPEALABILITY

A Certificate of Appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To meet this burden, an applicant must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).  Mbewe has failed to make a substantial showing that he was denied a constitutional right, and the court finds that reasonable jurists would not find the denial of habeas relief in this case debatable.  Accordingly, a certificate of appealability shall not issue.[21]

## CONCLUSION

For the above reasons, the court concludes that Mbewe's Petition provides no grounds for habeas corpus relief.  Accordingly, the Petition is DENIED and DISMISSED.

A separate Order follows.

---

[21] Denial of a certificate of appealability in the district court does not preclude Mbewe from requesting one from the court of appeals.

December 16, 2016                          _____/s/_____
                                           James K. Bredar
                                           United States District Judge